UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AWOKE GEBRETSADIKE,<br><br>Plaintiff,<br><br>v.<br><br>THE TRAVELERS HOME AND MARINE INSURANCE COMPANY,<br><br>Defendant. | Case No. 1: 14-cv-02059 (CRC) |

## MEMORANDUM OPINION

*Pro se* plaintiff Awoke Gebretsadike sued his auto insurer—Traveler Home and Marine Insurance Company ("Travelers")—for allegedly failing to honor the terms of his automobile insurance policy after a hit-and-run driver struck his car on New Year's Eve 2011.  At the motion-to-dismiss stage of the suit, the Court permitted two of Gebretsadike's claims to proceed to discovery:  first, his contention that Travelers violated the District of Columbia Consumer Protection Procedures Act ("DCCPPA") by not providing him with a full copy of his insurance policy, and second, his claim that Travelers breached the policy by not reimbursing him under its personal-injury-protection or uninsured-motorist coverage provisions.  Gebretsadike v. Travelers Home & Marine Ins. Co., 103 F. Supp. 3d 78, 84–86 (D.D.C. 2015).  With discovery now complete, Travelers moves for summary judgment on these remaining claims.  For the reasons explained more fully below, the Court will grant Travelers' motion on the DCCPPA claim because the company has established that it did in fact provide Plaintiff with a copy of the policy.  It will also grant Travelers' motion on Plaintiff's allegation that he was entitled to personal injury protection under the policy, as Gebretsadike failed to properly elect that coverage within the required time period.  Because Gebretsadike further failed to cooperate in the claim settlement process, the Court will likewise grant Travelers' motion with respect to his uninsured-motorist

coverage, but with one caveat: Through the course of litigation, Gebretsadike has established—and Travelers has acknowledged—that he is entitled to $5,421.50 in medical expenses. The Court will therefore direct Travelers to reimburse Gebretsadike for that amount.

### I.     Background

On New Year's Eve of 2011, Mr. Gebretsadike was driving to a restaurant in D.C. when another car crashed into him. Compl. ¶ 1–2. As a result of the accident, Gebretsadike briefly lost consciousness and suffered injuries to his head and leg. Id. The other driver fled the scene and Gebretsadike reported what details he could remember to the police. See Def.'s Mem. Supp. Mot. Summ. J. ("MSJ"), Ex. 1. Gebretsadike had acquired automobile insurance from an authorized Travelers agent six months earlier. Def.'s MSJ, Ex. 2. Decl. of Dorothy Kennard ("Kennard Decl.") ¶ 4. The initial policy was effective from June 15, 2011 through December 15, 2011, but it automatically renewed to cover an additional term of December 15, 2011 to June 15, 2012. Id. ¶¶ 6–9. Under the terms of the policy, Gebretsadike was potentially entitled to personal-injury-protection ("PIP") or uninsured-motorist coverage as a result of his accident. See Kennard Decl., Ex. C. The uninsured-motorist coverage provision required Travelers to pay medical and property damages resulting from an accident with an uninsured driver. Id. at 89. The D.C.'s Compulsory No-Fault Motor Vehicle Insurance Act of 1982, D.C. Code § 31-2405, governed Travelers' obligations to pay PIP benefits. Id. at 85.

A few days after the accident, Gebretsadike contacted Travelers to report the incident and discuss these coverage options. Kennard Decl. ¶¶ 11, 14. Travelers followed up by sending him a letter explaining how he could invoke PIP coverage and warning him that he must do so before March 2, 2012 or the option would expire. Kennard Decl., Ex F. The letter further clarified that Gebretsadike could *either* elect to use his PIP benefits, which had a $50,000 limit, or file a liability claim against the driver who had hit him, but that he could not pursue both types of claims except in

certain, statutorily circumscribed situations.  Id.  Gebretsadike then received a series of forms—including a PIP election form and a medical authorization form—to complete and return.  Kennard Decl., Ex. E at 125.  He signed and returned all of the forms to Travelers.  Id. at 125–29.  On the election form, however, he indicated that he wanted to invoke his PIP coverage as well as pursue a liability claim against the unknown driver.  Id. at 129.

Travelers promptly informed Gebretsadike that he could pursue only one of these options, id. at 145, and reminded him that his ability to elect PIP coverage would expire at the start of March.  Gebretsadike did not remit another PIP election form, and on March 5, 2012, Travelers closed his PIP claim.  Id. at 174.  While he was no longer eligible for PIP, Travelers told Gebretsadike that he was still entitled to his uninsured-motorist coverage because the police report indicated that he was hit by an unknown driver.  Def.'s Statement of Material Facts ¶ 31; see also Kennard Decl. ¶ 20; Kennard Decl., Ex. E at 165, 174.  During this exchange, Gebretsadike struggled to obtain medical treatment for his injuries because he lacked health insurance.  Kennard Decl., Ex. E at 148.  He requested help from Travelers, which sent him a list of medical providers but told him that they could not pre-authorize his treatment—only settle his claims after reviewing the medical bills he submitted.  Id. at 145, 148.  A long chain of correspondence ensued, spanning almost three years, between Gebretsadike and a series of Travelers claim representatives.  See Kennard Decl., Ex. E.

Gebretsadike went back and forth with Travelers on the uninsured motorist coverage requirements and the documentation he needed to provide to settle his claim.  He dealt simultaneously with another Travelers claim representative regarding the property damage to his

car.[1]  For a time, Gebretsadike stopped communicating with Travelers agents, but he re-initiated contact in the fall of 2013—after the police officially closed its investigation of his accident—to enlist Travelers' assistance in locating the hit-and-run driver.  Id. at 255, 259.  When Gebretsadike also inquired about his uninsured-motorist coverage, Travelers told him that they would need a medical release authorization, a list of his healthcare providers, and a wage verification form in order to process his claim.  Id. at 267–69.  In response, Gebretsadike submitted a letter from his former employer claiming that Gebretsadike had been earning $789 a week before the accident but had been unable to work since then.  Kennard Decl., Ex. G at 482.  Gebretsadike expressed discomfort though with providing the names of his doctors and asked Travelers if he could submit the medical bills instead.  Kennard Decl., Ex. E at 272–73.  Travelers agreed.  Id. at 273, 277.  Yet Gebretsadike still wavered on sending his medical expenses.  Id. at 284–85.  Travelers stated that they could not proceed with his claim adjustment without them, but offered him $500 in lieu of an official settlement.  Id. at 350–51.  Around this time, Gebretsadike also began to pursue legal remedies by seeking the assistance of *pro bono* counsel, and he requested that Travelers send him a complete copy of his policy along with any other records they had on file regarding his claims.  Id. at 287.  On March 18, 2014, a dissatisfied Gebretsadike "respectfully request[ed] [Travelers] not to send [him] any more email."  Id. at 474.  And on November 6, 2014, he filed this lawsuit.  Compl.

During the course of litigation, Travelers finally obtained medical records totaling $5,421.50 from Gebretsadike.  Kennard Decl. ¶ 26.  They also received an affidavit from Gebretsadike's allegedly former employer, who stated that he did not recall ever seeing or signing a letter on Gebretsadike's behalf.  Kennard Decl., Ex. G ¶ 5.  Despite this wrinkle, Travelers twice offered

---

[1] After reviewing the damages to Gebretsadike's car, Travelers declared it a total loss and Gebretsadike chose to have it salvaged.  Kennard Decl., Ex. E at 213.  Travelers released a settlement check for the salvage value of the car to Gebretsadike in May 2012.  Id.

during mediation to settle Mr. Gebretsadike's claim for $5,421.50.  Kennard Decl. ¶ 26.  Gebretsadike rejected both offers.  Id.

## II.     Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden to demonstrate an "absence of a genuine issue of material fact" in dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  For a factual dispute to be material, it must "be capable of affecting the substantive outcome of the litigation; to be genuine, [it] must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party." Laningham v. U.S. Navy, 813 F.2d 1236, 1242–43 (D.C. Cir. 1987).  In considering if there are genuine factual disputes, the Court will consider "pleadings, depositions, answers to interrogatories, admissions on file, [and affidavits]" presented by both parties.  Celotex Corp., 477 U.S. at 323.

In ruling on a motion for summary judgment, a court accepts as true the nonmovant's evidence and draws all reasonable inferences in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  But "while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to come forward with 'specific facts showing that there is a *genuine issue for trial.*'" Klayman v. Judicial Watch, Inc., 628 F. Supp. 2d 112, 123–24 (D.D.C. 2009) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  In doing so, the nonmovant may not rely simply on allegations or conclusory statements.  Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006).  Thus, "[i]f the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (internal citations omitted).  "[M]ere allegations or denials in the adverse party's pleadings," for

example, "are insufficient to defeat an otherwise proper motion for summary judgment." Williams v. Callaghan, 938 F. Supp. 46, 49 (D.D.C.1996).

### III. Analysis

#### A. District of Columbia Consumer Protection Procedures Act Claim

This Court previously noted that, under the DCCPPA, it is "the insurer's duty to spell out in plainest terms—terms understandable to the man in the street—any exclusionary or delimiting policy provisions," and that "this duty logically encompasses an obligation to provide a policyholder with a complete copy of the policy." Gebretsadike, 103 F. Supp. 3d at 84 (quoting Whiting v. AARP, 637 F.3d 355, 360 (D.C. Cir. 2011)) (internal quotations omitted). Travelers has since established—through a declaration and a copy of its mailed policy—that it sent Gebretsadike a copy of his entire policy within days of purchase. On June 15, 2011, Gebretsadike provided an Ace Insurance Services agent a signed copy of his application for Travelers' automobile insurance. Def.'s MSJ, Ex. 3, Decl. of Emebet Bekele ¶ 6. Travelers, that same day, mailed a copy of the purchased policy to the address Gebretsadike had provided on his application. Kennard Decl. ¶ 7; see also Kennard Decl., Ex. C. On November 17, 2011, Travelers also mailed Gebretsadike a summary of his renewed policy to that same address along with his updated insurance identification cards, which Gebretsadike acknowledged he received. Kennard Decl. ¶ 10; see also Kennard Decl., Ex. D.

A properly addressed letter creates a "presumption . . . that it was received by the addressee," Toomey v. D.C., 315 A.2d 565, 567 (D.C. 1974) (quoting Columbia Finance Co. v. Worthy, 141 A.2d 185, 186 (D.C. Mun. Ct. 1958)), a presumption that Gebretsadike has failed to rebut. Rather than explaining why he did not receive the mailed policy, Gebretsadike responds by insisting that the Ace Insurance agent did not personally provide him a copy of the policy nor did he receive a full copy in November 2011 when his policy was renewed. Pl's Mem. Opp'n Def.'s MSJ

2–3, 6. These arguments, however, are beside the point because they do not negate that Travelers had already sent a copy of the entire policy to Gebretsadike in June.

As to Gebretsadike's further claims that Travelers violated the DCCPPA by misleading him about the terms of his policy, the overwhelming weight of the record says otherwise. The parties' voluminous correspondence over the course of three years shows that Travelers attempted—via telephone, letters, and email—to explain the terms and provisions of its insurance policy to Gebretsadike. Travelers repeatedly clarified the extent of his coverage, the types of coverage he was entitled to, and the documentation it needed in order to settle his claim. See generally Kennard Decl., Ex. E. And when Gebretsadike, after consulting with his *pro bono* attorneys, requested an additional copy of his policy, Travelers promptly provided him with one. Kennard Decl. ¶ 12. The Court thus concludes that no reasonable juror could find that Travelers violated the DCCPPA and will, accordingly, award summary judgment in its favor.

      B.      Breach of Contract Claims

To prevail on a breach of contract claim in the District of Columbia, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach. Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009) (citing San Carlos Irrigation & Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989)); see also Jia Di Feng v. See-Lee Lim, 786 F. Supp. 2d 96, 104 (D.D.C. 2011) (citations omitted). The parties agree that a valid contract existed between the parties—Gebretsadike's insurance policy—and that Travelers had a duty to honor it. Gebretsadike alleges, however, that Travelers breached this contract by failing to provide him with coverage under the personal-injury-protection and uninsured-motorist provisions of his policy.

1. <u>Personal Injury Protection Coverage</u>

Travelers' insurance policy and D.C.'s No-Fault Statute require insured individuals to elect PIP coverage within 60 days of a qualifying accident. D.C. Code § 31-2405(a); Kennard Decl., Ex. A. Yet even if properly elected, an individual cannot pursue PIP coverage along with liability claims—like uninsured-motorist coverage—*unless* the injury results in:

> [a] substantial permanent scarring or disfigurement,
>
> [b] substantial and medically demonstrable permanent impairment which has significantly affected the ability of the victim to perform his or her professional activities or usual and customary daily activities,
>
> [c] a medically demonstrable impairment that prevents the victim from performing all or substantially all of the material acts and duties that constitute his or her usual and customary daily activities for more than 180 continuous days; or
>
> [d] [t]he medical and rehabilitation expenses of a victim or work loss of a victim exceeds the amount of personal injury protection benefits available.

D.C. Code § 31-2405. Travelers agrees that Gebretsadike's policy entitled him to PIP as a result of his accident. But the defense Travelers raises is that Gebretsadike failed to properly elect PIP within the statutory and contractual time frame, thus forfeiting his right to invoke that coverage now.

Travelers reinforces its position by pointing to a series of communications it had with Gebretsadike explaining these requirements. First, within a week of the accident, Travelers sent Gebretsadike a package with a letter explaining the election process, the PIP election form, and a reminder of the 60-day window for electing it. Kennard Decl., Ex. F. Second, when Gebretsadike returned the form—indicating that he wanted to pursue both a PIP *and* liability claim—Travelers contacted him again to explain why he needed to choose between the two. Travelers continued to follow up with Gebretsadike for the next two months, seeking to obtain a corrected election form from him before the March 2 deadline. Kennard Decl., Ex. E at 160, 165 ("I also do need the

election form completed and return[ed] to me by March 2, 2012 if you are going to use the personal injury protection coverage on your policy.  As stated in prior emails, the first election form you sent was not valid as you elected both personal injury protection and bodily injury.  Unfortunately, you[r] coverage only allows you to use one of the elected coverage's not both.").  Gebretsadike never provided another election form to Travelers.  His statements, on the contrary, indicated that he was willing to forego PIP if it meant preserving his legal remedies against the hit-and-run driver.  Id. at 165 ("There's no way I choose something that stops me from taking the other driver to legal procedures.  I guess choosing PIP alone does that.").  And finally, on March 5, 2012, Travelers informed Gebretsadike that the PIP election period had passed.  This left Gebretsadike with the option to file a claim either against the hit-and-run driver or with Travelers under the uninsured-motorist provision in his policy.  Id. at 174.  The evidence establishes that Gebretsadike knew he needed to properly elect PIP before March 2, 2012 in order to receive its benefits.  Despite this knowledge, Gebretsadike failed to act, relieving Travelers of any obligation to provide PIP coverage.

As noted above, however, there are exceptions to the bar against simultaneously pursuing PIP and liability claims.  While Travelers summarily presented the text of the statutory exceptions to Gebretsadike in its first letter to him after the accident, Kennard Decl., Ex. F, it glossed over these exceptions in all further communications and in its briefing to this Court.  The Court will not be so glib in its assessment of whether any of the exceptions could have applied.

For Gebretsadike to survive summary judgment on this issue, he must "make a prima facie showing that the injury falls within one of the categories of the No-Fault statute."  State Farm Mut. Auto. Ins. Co. v. Hoang, 682 A.2d 202, 207 (D.C. 1996) (citing Smith v. Washington Metro. Area Transit Auth., 631 A.2d 387, 392 (D.C. 1993)).  And if a reasonable juror could infer from the record that an exception applies, then a genuine factual issue would remain, requiring a trial.

Hoang, 682 A.2d at 207–08. Of the four exceptions, the only potentially applicable one here is the third—"a medically demonstrable impairment that prevents the victim from performing . . . customary daily activities for more than 180 continuous days."[2] D.C. Code § 31-2405. The D.C. Court of Appeals has required objective, credible evidence when assessing a plaintiff's claim under § 31-2405(b). See id. (citing Oswing v. Shaw, 609 A.2d 415, 429 (N.J. 1992)); see also Smith, 631 A.2d at 391–92. In ruling on a summary judgment motion, the Smith court held that "without sworn medical affidavits as to the extent of [the plaintiff's] impairment for 180 continuous days," the plaintiff's "conclusory answers [to interrogatories were] inadequate to meet the . . . exception to the No-Fault statute." Id. at 392. Gebretsadike, like the plaintiff in Smith, has not presented sworn medical affidavits—or even a single medical record—to show that he suffered from a debilitating impairment for more than 180 days. And the only "objective" evidence that he presented to Travelers on the extent of his injury was a letter from the owner of a cell phone store stating that Gebretsadike had worked there but was unable to work from January 2012 to July 2012 due to his injuries. However, the purported author of the letter has disavowed any knowledge of it.[3] Def.'s MSJ, Ex. 4. Without any objective, credible evidence to rely on, this Court concludes that

---

[2] Gebretsadike did not present any medical records to the Court. Consequently, there is no evidence that he suffered "permanent scarring," "disfigurement," or a "permanent impairment" from the accident. Nor do his medical expenses, acknowledged to be approximately $5,421.50 in total, exceed the $50,000 limit of his PIP coverage.

[3] The store's owner, Pushpinder Chadha, stated in a sworn declaration that while Gebretsadike "provided some services as an independent contractor," he was never an employee. Def.'s MSJ, Ex 4, Decl. of Pushpinder Chadha ¶ 4. Chadha also averred that he did not recall ever seeing or signing the letter provided by Gebretsadike to Travelers during the claim adjustment process. Id. ¶ 5. Although Gebretsadike presented counter-declarations from customers of the cell phone store confirming that he worked there, they do not create a genuine dispute of material fact because they do not speak to the extent of his injury or the amount of time he was unable to work. Pl.'s Mem. Opp'n Def.'s MSJ, Ex. 6–8.

Gebretsadike's medical injuries do not fall within one of the No-Fault statute's listed exceptions and, therefore, Travelers did not breach his policy by failing to provide PIP coverage.

### 2. Uninsured Motorists Coverage

Travelers next maintains that its policy "imposes a duty on the insured to cooperate in the investigation and settlement of any claims." Def.'s MSJ 22. If an insured fails to comply with this duty, the insurance company is unable to carry out its end of the bargain because it does not have the information necessary to settle the claim. The "Duties After an Accident or Loss" section of Gebretsadike's policy requires insured individuals to "[c]ooperate with us in the investigation, settlement or defense of any claim or suit" and "[a]uthorize us to obtain [] medical reports; and [] other pertinent records." Kennard Decl., Ex. C at 77.

Courts have recognized this duty to cooperate, akin to a condition precedent, and have voided contracts when they have found an insured did not comply with it. See, e.g., Akers v. Liberty Mut. Grp., 847 F. Supp. 2d 21, 26–27 (D.D.C. 2012) ("An insured party's compliance with insurance policy provisions is viewed as a condition precedent to indemnification." (citing Claflin v. Commonwealth Ins. Co., 110 U.S. 81, 91 (1884))). The Akers court went on to provide examples of how an insured could fail to adequately cooperate: by refusing to produce relevant documents, misrepresenting or intentionally concealing material facts, or giving vague, non-responsive answers to key questions about the nature of the loss. See 847 F. Supp. 2d at 25–26. The court there awarded summary judgment to the insurer because the insured did not corroborate her employment, made misleading and contradictory statements, and refused to produce requested documents during the claim adjustment process.

The central question here is whether Gebretsadike likewise failed in his duty to cooperate. Travelers points to three examples to establish that he did. First, he never provided Travelers a medical authorization form. Second, he did not provide Travelers with a list of medical providers.

And third, he did not provide Travelers with the medical bills that resulted from the treatment he received for injuries sustained in the accident. Def.'s MSJ 24–25. The Court will address each of these in turn. When Gebretsadike first contacted Travelers after his accident, they sent him a medical authorization release form. On January 16, 2012, he emailed the signed release form back to the Travelers agent.[4] Kennard Decl., Ex. E at 125–27. Gebretsadike's later communications with Travelers were plagued by a continuing misunderstanding regarding this form because Gebretsadike (understandably) asked why another authorization was needed while as the agents he spoke to maintained that he had never signed one. On October 31, 2013, for instance, Gebretsadike wrote, "[w]hat type of my medical or any kind of information you or Travelers collected/learnt/accessed/tried to get using the release form I signed for you last time or otherwise?" Id. at 283–84. And on November 14, 2013, a claims representative emailed, "[y]ou never signed the medical authorization." Id. at 322. At bottom, despite the confusion, the record is clear: Travelers received a signed medical authorization from Gebretsadike in January 2012, so he did not fail in his duty to provide one.

This same evidence—emails between Gebretsadike and Travelers spanning three years—also establishes that Gebretsadike refused to send Travelers a list of his medical providers because he decided that he would collect the medical bills and send them to Travelers himself. Unlike in Akers, then, this was not an outright refusal to produce documents. Gebretsadike, however, did not provide Travelers with the promised bills before initiating this lawsuit. During the course of litigation, Travelers did obtain medical records from Gebretsadike totaling $5,421.50 and offered to settle his claim for that amount. Kennard Decl. ¶ 26; see also Def.'s MSJ 15. In short, Travelers, at

---

[4] The release form included a statement indicating that it was valid for the duration of the associated claims. Kennard Decl., Ex. E at 127.

this time, has all of the information necessary to settle Gebretsadike's claim regarding his medical expenses, and none of the information necessary to reimburse him for any other type of expense.

The Court, therefore, concludes that no factual dispute remains as to the $5,421.50 in medical bills accrued by Gebretsadike after his accident, and it will direct Travelers to reimburse him accordingly.  As to any other bodily injury or lost wage claim, however, the Court finds that Gebretsadike failed in his duty to cooperate by not providing Travelers with the necessary and requested documentation, thus absolving Travelers of further obligations under the policy. Consequently, the Court will award summary judgment to Travelers on Gebretsadike's breach of contract claims with the exception of the $5,421.50 in medical bills previously mentioned.

### IV.    Conclusion

For the foregoing reasons, the Court will grant Defendant Travelers Home and Marine Insurance Company's Motion for Summary Judgment.  An Order will accompany this Memorandum Opinion.

                                                                                            _____
                                                                                            CHRISTOPHER R. COOPER
                                                                                            United States District Judge

Date:      September 22, 2016